```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
VICTOR J. DEFAZIO, JACK FINKELSTEIN,
JAMES COLLINS and HENRY GEBHARD,

                        Plaintiffs,            ORDER
                                               CV 05-5712 (ADS)(ARL)
        -against-

KEVIN WALLIS, et al.,

                        Defendants.
----------------------------------------------------------X
```
**LINDSAY, Magistrate Judge:**

Before the court is the defendant Kevin Wallis' motion to disqualify plaintiffs' counsel. By order dated March 13, 2006, Judge Spatt referred the motion to the undersigned to issue an order resolving all questions of law and fact pursuant to Fed. R. Civ. P. 72(a). A hearing was held on May 18, 2006, at the close of which the parties were granted the opportunity to submit post-hearing submissions. The defendant Wallis supplemented his motion by letter dated June 7, 2006, and the plaintiffs' counsel supplemented their opposition to the motion by letter dated June 14, 2006.[1] For the reasons stated herein, the defendant's motion is denied.

## BACKGROUND

The plaintiffs commenced this action on December 8, 2005, alleging, among other things, violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq. On January 6, 2006, Kevin Wallis ("Wallis") moved to disqualify Dinerstein & Lesser, P.C. and Robert J. Dinerstein (collectively "Dinerstein") from representing the plaintiffs in this action.

---

[1] The court will not consider Mr. Weissman's letter dated July 31, 2006, Mr. Dinerstein's letter dated August 2, 2006, Mr. Weissman's letter dated August 2, 2006, Mr. Dinerstein's letter dated August 4, 2006, or Mr. Weissman's letter dated August 4, 2006. The letters, which were submitted without leave of court, simply reiterate the arguments made by the parties in their underlying papers and at the hearing.

Wallis contends that Dinerstein had previously represented his company, Regional Medical Transport ("RMT"), in connection with its application to acquire an ambulance license from Admiral Ambulance Services, Inc. Wallis Aff. at ¶ 4. Wallis further contends that as a result of that relationship, Dinerstein obtained confidential information concerning Wallis' background, health, and finances, which is now being used against Wallis in this action. *Id.* at ¶ 5. Although Dinerstein acknowledges that he did render legal services for RMT, Dinerstein argues that he did not render legal services for Wallis, nor did the services he rendered for RMT entail the disclosure of confidential information. Dinerstein Aff. at ¶¶ 25, 35-38.

It is undisputed that, in 1999, Dinerstein was retained by RMT[2] in connection with an administrative proceeding before the Regional Emergency Medical Services Council of the City of New York ("Medical Services Council"). Dinerstein Aff. at ¶ 38.[3] The engagement "involved the completion of an application for the approval of the desired transfer of ambulance operating authority" from Admiral Ambulance Services, Inc. to RMT. *Id.* at ¶¶ 37-38. Although Dinerstein takes issue with Wallis' characterization of the procedure as a "due diligence," the evidence is clear that Dinerstein assisted RMT in completing the application used by the Medical Services Council to evaluate an applicant's fitness and competency before the complete application is submitted to the New York State Department of Health for its final approval. *Id.* at ¶¶ 37, 38, 49, 50.

Dinerstein's involvement in the procedure, however, remains disputed. According to

---

[2] RMT is the ambulance arm of Regional Health Group, a now defunct New York company that provided consulting, billing and educational services for the health care community. Katzman Aff. at ¶ 3.

[3] According to Wallis, in 1999, he was the chief executive officer of Regional Medical Transportation. 5/18/06 Tr. at 9.

Wallis, Dinerstein attended meetings, spoke with members of the Medical Services Council, and answered question related to the ability of Wallis and RMT's owners to operate the business. Wallis Aff. at ¶ 5. In his moving papers, Wallis contends that as a result of his involvement in the process, "Dinerstein came to have intimate knowledge of every aspect of [his] business, of [his] background, of [his] health, of [his] finances, and the like." *Id.* At the hearing, however, Wallis clarified that the "confidential information" imparted to Dinerstein involved only his mental, employment and educational background, which he had misrepresented on the resume submitted as part of the application.[4] 5/18/06 Tr. at 10-15, 64-65. Wallis stated that he wanted to be forthcoming with the Medical Services Council and that he asked Dinerstein to correct the information in the pending application. *Id.* at 24, 65.

Wallis also testified that Dinerstein assisted him when a former employee from North Shore Hospital began extorting him. *Id.* at 23. Wallis stated that the former employee threatened to expose the errors in the resume and that RMT paid him "because [they] didn't want anybody to go before the Regional [Medical] Council and upset [their] application for licensure for the company." *Id.* at 24. Although the court questioned why Wallis would have paid someone to keep that information quiet if he intended to be forthcoming with the Medical Services Council,

---

[4]At the hearing, counsel for Wallis acknowledged that his client's testimony during the hearing covered all of his allegations that provide support for the motion to disqualify. Accordingly, it was agreed that the court would not consider any other contact with Dinerstein described in the Wallis affidavit as proof of a confidential relationship. 5/18/06 Tr. 35-36. The court also determined that Dinerstein would not be a necessary witness because of his opinion about the accuracy of the resume, and thus, that issue will not be addressed by the court in this order. Id. at 52-53.

3

Wallis insisted that RMT gave money to Dinerstein to give to a private investigator who would handle the problem. *Id.* at 22.

Dinerstein has a contrary account of the events. Dinerstein testified that Wallis never apprised him of the "truthful information" before he filed RMT's application. 5/18/06 Tr. at 44. Dinerstein stated all he did, in connection with the application, was attach whatever resume his clients gave him, without questioning its accuracy. *Id.* at 43, 51. Dinerstein did state, however, that had Wallis told him that his resume was false, he would have corrected the information. *Id.* at 51-52. He indicated that as an officer of the court, and because of his reputation with the Medical Services Council and the Department of Health, he would have been obliged to correct the official record, but that he did not learn of the inaccuracies until after Regional Health Group filed for bankruptcy. *Id.* at 52.

Dinerstein further testified that any of the information used in the instant complaint came from a false resume submitted in connection with RMT's later application to transfer ambulance operating authority from National Emergency, Inc., an application submitted without Dinerstein's assistance. 5/18/06 Tr. at 31, 44. In fact, Dinerstein claims that he first became aware that faulty information may have been submitted to the Medical Services Council in connection with the Admiral Ambulance application was when he received copies of the National Emergency application. *Id.* at 50.

With respect to the extortion issue, Dinerstein testified that Wallis did contact him to discuss a phone call he had received from a man who Wallis had defrauded with mob affiliations. *Id.* at 46. Dinerstein stated that he put Wallis in touch with a private investigator because it

4

wasn't a legal matter, but that he agreed to bill the investigator's fees through Dinerstein & Lesser. *Id.* at 46-47.

## DISCUSSION

It is generally accepted that "an attorney may not knowingly reveal a confidence of his client or use a confidence of his client to the disadvantage of the client." *Evans v. Artek Sys. Corp.,* 715 F.2d 788, 791 (2d Cir. 1983)(citing Canon 4-101(B) and DR 4-101(B)). It is equally well-settled that a client has a right to freely choose his counsel. *See Hempstead Video, Inc. v. Inc. Vill. of Valley Stream,* 409 F.3d 127, 132 (2d Cir. 2005). To balance these principles, the courts in this circuit have adopted a three-prong test to resolve disqualification motions. An attorney will be disqualified in situations involving successive representation where a moving party can show that (1) he is "a former client of the adverse party's counsel;" (2) "there is a substantial relationship" between the issues in the present lawsuit and the subject matter of the counsel's prior representation of the movant; and (3) "the attorney . . . had access to, or was likely to have access to, relevant privileged information in the course of his representation of the client." *Id*. at 133. Moreover, "[t]he importance of preserving client confidences requires that all doubts be resolved in favor of disqualification." *Hickman v. Burlington Bio-Medical Corp.,* 371 F. Supp. 2d 225, 229 (E.D.N.Y. 2005). With these standards in mind, the court addresses Wallis' arguments.

### A. Substantial Relationship

The court first addresses the middle prong of the test, which in the instant application is the easiest to resolve. The substantial relationship "test is met 'if the relationship between the issues in the prior and present case is 'patently clear[,] . . . 'identical' or 'essentially the same.'"

*Hickman,* 371 F. at 230 (citing *Gov't of India v. Cook Indus.*, 569 F.2d 737 (2d Cir. 1978)(citations omitted). Here, one of the issues underlying the present action is whether Wallis misled investors about his educational and employment background to induce them to invest in the Enterprise. *See* Ex. 1; Complaint ¶¶ 44-59. The information that Wallis contends Dinerstein acquired as a result of his representation of RMT also involves Wallis' misrepresentation of his educational and employment background. Accordingly, the court finds that there is a substantial relationship between the issues in the present lawsuit and the subject matter of the counsel's prior representation, and thus, the middle prong of the test for disqualification has been met.

**B. The Party Seeking Disqualification is a Former Client of the Attorney Sought to be Disqualified.**

Determination of the first prong of the test for disqualification is not as clear. Although Wallis testified that he was a former client of Dinerstein, Dinerstein vehemently denies that contention. Dinerstein was retained by RMT in connection with the submission of its application to transfer ambulance operating authority from Admiral Ambulance Services, Inc. Dinerstein Aff. at ¶¶ 37-38. Dinerstein was not directly retained by Wallis. Nonetheless, Wallis was RMT's chief executive officer and so the question remains whether the retention of an attorney by a corporation creates an attorney-client relationship between the corporation's attorney and one of its officers. The court believes that for the purposes of this application it did.

"A 'corporate attorney' - - whether an in-house lawyer or a law firm that serves as counsel to the company - - owes a duty to act in the interests of the corporate entity itself. His client is the corporation." *Evans,* 715 F.2d at 792. However, in a disqualification context, "the issue . . . is not whether [counsel's] relationship to [the moving party] is in all respects that of

6

attorney and client, but whether there exist sufficient aspects of an attorney-client relationship 'for purposes of triggering inquiry into the potential conflict involved in [counsel's] role as plaintiff's counsel in this action." *Marshall v. State of N.Y. Div. of State Police,* 952 F. Supp 103, 108 (N.D.N.Y. 1997)(citing *Glueck v. Jonathan Logan, Inc.,* 653 F.2d 746, 749 (2d Cir. 1981). In some instances, courts have, therefore, limited subsequent representation where the adverse interests are not those of a client in the traditional sense. *Id.; see also Emle Indust., Inc. v. Patentex, Inc.,* 478 F.2d 562 (2d Cir. 1973)( disqualifying attorney who previously represented corporate owner of defendant corporation). For example, "courts have found an attorney-client relationship . . . exists when the party divulging confidences and secrets to an attorney believes that he is approaching the attorney in a professional capacity with the intent to secure legal advise." *April Broadcasting, Inc. V. Giordano,* 1996 U.S. Dist. LEXIS 3594 * 10 (S.D.N.Y. Mar. 25, 1996); *Glueck.,* 653 F.2d at 749 (disqualifying plaintiff's counsel who had previously represented trade organization of which defendant was a member).

Under these less traditional circumstances, the factors considered by courts "in determining whether an attorney-client relationship existed include: 1) whether a fee arrangement was entered into or a fee paid; 2) whether a written contract or retainer exists; . . . 6) whether the purported client believes that the attorney was representing him and whether this belief was reasonable." *Id.* While Wallis has not produced a copy of the retainer agreement, it is clear that Wallis retained Dinerstein on behalf of RMT and that he thought that, as chief executive officer, Dinerstein was also representing him. Accordingly, the court finds that to the extent that Wallis provided Dinerstein with confidential information, a disputed issue that is addressed in detail

below, Wallis did so believing that a confidential relationship existed between himself and Dinerstein.

C. **Access to Privileged Information**

With respect to the third prong of the disqualification test, Wallis contends that Dinerstein obtained "confidential information" in the course of his representation concerning his falsified resume and the fact that he had suffered a nervous breakdown. 5/18/06 Tr. at 10-15. It is on this prong of the test that Wallis' motion fails. The court does not believe that Wallis gave the information to Dinerstein and, even if he did, the court finds that the information was not confidential.

To begin with, Dinerstein testified at the hearing that Wallis never approached him regarding his erroneous resume or his prior psychiatric problems. Specifically, Dinerstein testified that:

> A. . . . I was totally unaware of the discrepancy between what I understood to be Mr. Wallis' qualifications and what I later learned to be his qualifications. Now, I can - - as I sit here today, I can't tell you that I even submitted his curriculum vitae in support of the application. His description of the process is, shall we say exaggerated. It's a boilerplate application, with regard to character and fitness it's supported by an application, one page, that you sign saying you weren't convicted of any sexual crimes or felonies, and you submit a curriculum vitae. I don't know that his is the one that went in. I would assume it was. And I have no recollection as to what he had on there.
>
> \* \* \*
>
> Q. Mr. Dinerstein, did he tell you this truthful information prior to your filing of the application?
>
> A. No. But I want you to understand. That doesn't mean that his CV that was submitted was inaccurate. I just didn't know what to look for. I accepted it at face value.

8

* * *

>THE COURT: . . . [I]t would be important to know what's in the submission to the State, because presumably if a lawyer is told that there's inaccurate information then the State record may reveal the accurate information or it may reveal that Mr. Wallis' CV was never even submitted to the State, which would resolve some of the credibility issues.
>
>MR. WEISSMAN: Your honor, we can FOIL them.

5/18/06 Tr. at 43-44.

Unfortunately, neither party submitted the application to transfer ambulance operating authority from Admiral Ambulance Services to RMT, which would have presumably contained the resume at issue. Therefore, weighing the credibility of the parties' conflicting statements is, at best, difficult. The court does, however, find Dinerstein's testimony to be more credible. Dinerstein did confirm, in his supplemental papers, that "he did not correct the resume because he knew of no misinformation in it." Spivak 6/14/06 letter at 3. The court believes that any attorney involved in an application of this nature would have corrected the application had a client advised him that the application contained false information. Moreover, Wallis testimony concerning the extortion is more consistent with Dinerstein's contention that he never came forward with the correct information. Nonetheless, because "all doubts [are to] be resolved in favor of disqualification," see *Hickman*, 371 F. Supp 2d at 229, the court will go a step further and address the third prong of the disqualification test assuming that Wallis did provide Dinerstein with the information.

Here, even assuming that Wallis did provide Dinerstein with the correct information concerning his mental, employment and educational background, Wallis' motion still must fail.

9

The ultimate objective in weighing disqualification questions is to ensure that litigation will not be tainted by improper disclosure. The present litigation will not be tainted because the information that Wallis claims to have given Dinerstein was not confidential. The court's colloquy at the hearing emphasizes this point:

> BY THE COURT:
>
> Q. Just clarify one point for me. You testified that you gave Mr. Dinerstein all the truthful information about your educational and employment history. . . . Is that right?
>
> A. Yes, that right. I also gave him all the information that was a problem. So in other words, I gave him everything.
>
> Q. Right, you gave him the mental, the educational and employment histories that were a problem because they had been previously incorrectly represented, correct?
>
> A. Correct.
>
> Q. And you gave him correct information?
>
> A. Correct.
>
> Q. And when you gave him that correct information it was your intent that he publish that to the State, correct, the correct information?
>
> A. No, the - - I - - my - - what I wanted to do, Your honor, was I needed . . . what [Dinerstein] said to me very clearly was, the information on the application must be 100% accurate.
>
> Q. Right.
>
> A. Right, so yes, we disclosed the accurate information on the application to the State.

Tr. at 64-65. By his own admission, the "confidential" information he gave to Dinerstein, that is, correct information concerning his mental, educational and employment histories, was given to

him for the express purpose of making it public information. Wallis cannot now contend that it is confidential information when he never had an expectation that the information was to be kept private. Accordingly, Dinerstein did not obtain or have access to any confidential information as a result of his representation of RMT.[5] For all the foregoing reasons, the motion is denied.

Dated: Central Islip, New York
      August 11, 2006

SO ORDERED:

/s/
ARLENE R. LINDSAY
United States Magistrate Judge

---

[5] Having concluded that the information imputed to Dinerstein was not confidential, the court need not address the issue raised at the hearing concerning whether the subsequent disclosure of the confidential information in the public forum eliminates the need to disqualify Dinerstein.